UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------x

MICHAEL CAPUTO,

           Petitioner,

Civil Action No. 04-10732-JLT

vs.

KENNETH NELSON,

           Respondent.
-------------------------------------------x

**RESPONDENT'S MEMORANDUM OF LAW
IN OPPOSITION TO PETITIONER'S PETITION FOR
WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254**

The respondent, Kenneth Nelson, hereby submits the following memorandum of law in

opposition to the petition for a writ of habeas corpus filed by the petitioner, Michael Caputo

(hereinafter, "the petitioner"). As is set forth in greater detail below, the petition should be

denied because the petitioner's claim under the Fourth Amendment is not cognizable on habeas

review where, as here, the petitioner has had a full and fair opportunity to litigate the issue in the

state courts. Moreover, the petition should be denied because the petitioner cannot demonstrate

that the state court's adjudication of his *Miranda* claim resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States.

## PRIOR PROCEEDINGS

On November 17, 1989, a Suffolk County grand jury returned two first-degree murder indictments against the petitioner, Michael P. Caputo, for the stabbing deaths of his mother-in-law, Angelina Mae Papastamos, and his estranged wife, Helen Caputo. *See* Docket Sheet, *Commonwealth v. Michael P. Caputo*, Suffolk County Superior Court Criminal Action No. 1989-082853-54, attached to the Supplemental Answer, filed herewith (hereinafter, "Supp. Ans.") as Exhibit 1. On January 28, 1991, the petitioner filed multiple motions to suppress evidence.[1] *See* Defendant's Motions to Suppress Evidence and Statements in *Commonwealth v. Michael P. Caputo*, Supp. Ans., Exhibit 2. After an evidentiary hearing,[2] Superior Court Associate Justice Elbert Tuttle denied these motions, except to order the suppression of personal papers or notebooks seized by the police during the search of the petitioner's home pursuant to a search warrant (on the grounds that those items were not described in the warrant as items intended to be seized). *See* Memorandum of Decision on Defendant's Motions to Suppress Evidence and Statements in *Commonwealth v. Michael P. Caputo*, Supp. Ans., Exhibit 3.

On March 21, 1991, after a trial before Justice Tuttle and a jury in the Suffolk County Superior Court, the jury returned guilty verdicts on both indictments. Supp. Ans., Exhibit 1; Brief for the Commonwealth, *Commonwealth v. Michael P. Caputo*, Massachusetts Supreme Judicial Court No. 2002-06103, attached to Supp. Ans. as Exhibit 7, p. 4. The jury's guilty verdicts were based on both deliberate premeditation and extreme atrocity or cruelty grounds. *Id.*

---

[1] Three of these motions relate to the facts which are at issue in the instant habeas petition; the fourth appears to pertain to unrelated facts (statements to a Mr. Telford, prior to the murder) and is not the subject of this habeas petition.

[2] Facts relevant to the motion to suppress are set forth in the "Statement of Facts" below.

Justice Tuttle imposed consecutive life sentences for these offenses. *Id.*

The petitioner's appeal from those convictions was docketed in the Massachusetts

Supreme Judicial Court ("the SJC") on November 23, 1992. Supp. Ans., Exhibit 1; Supp. Ans.,

Exhibit 7, p. 4. Subsequently, on February 15, 1994, the petitioner filed a motion for a new trial

pursuant to Mass. R. Crim. P. 30(b) and M.G.L. ch. 278, § 33E. *See id;* Motion for a New Trial,

*Commonwealth v. Michael P. Caputo,* Massachusetts Supreme Judicial Court No. 2002-06103

(Suffolk County Criminal Actions Nos. 082853-54), Supp. Ans., Exhibit 4. On May 17, 1995, a

single justice of the SJC remanded the motion to the Superior Court for disposition. *See* Supp.

Ans., Exhibit 1; Supp. Ans., Exhibit 7, p. 4. On February 26, 1996, a Justice of the Superior

Court denied the petitioner's motion in a written memorandum and order. *See* Memorandum of

Decision and Order on Defendant's Motion for a New Trial, *Commonwealth v. Michael P.*

*Caputo*, Supp. Ans., Exhibit 5. The petitioner's appeal from the denial of his motion for a new

trial was docketed in the SJC on June 12, 1996. Supp. Ans., Exhibit 7, p. 5. The appeals from

the conviction and from the denial of the motion for new trial were decided by the SJC on April

15, 2003. *See Commonwealth v. Michael P. Caputo,* 439 Mass. 153, 786 N.E.2d 352 (2003). In

its decision, the SJC affirmed the judgments of the trial court and upheld the petitioner's

convictions. *See id.*

## STATEMENT OF FACTS

The SJC's recitation of facts is entitled to a presumption of correctness under 28 U.S.C. §

2254(e)(1). *See Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000); *Avellar v. DuBois*, 30

F.Supp.2d 76, 79 (D.Mass. 1998); *Otsuki v. DuBois*, 994 F.Supp. 48, 51 & n.3 (D.Mass. 1998);

*cf. Sumner v. Mata*, 449 U.S. 539, 545-46 (1981)(holding that the presumption of correctness

3

under former habeas statute applied to "factual determinations made by state courts, whether the

court be a trial court or appellate court"). This deference extends to inferences drawn by the

state court from those factual determinations as well. *See Parke v. Raley*, 506 U.S. 20, 35

(1992); *Flores v. Marshall*, 53 F.Supp.2d 509, 514 (D.Mass. 1999).

The SJC found that the evidence presented at the hearing on the motion to suppress

included the following:

> At approximately 6:25 a.m., after the Plymouth police had been informed by the
> Boston police that the defendant was a suspect in a double homicide, six officers
> from the Plymouth police department, including Sergeant Thornton Morse and
> Sergeant Richard Dorman, arrived at the defendant's house. In an attempt to
> ascertain whether anyone was home, the police officers knocked repeatedly on the
> front and rear doors. After the police knocked for five minutes, the defendant
> opened the front door. Morse and Dorman introduced themselves, inquired as to
> the defendant's name, and asked whether they could enter the house to speak with
> him. The defendant responded, "Come on in."
>
> Inside the house, Dorman informed the defendant that the police were
> investigating a double homicide, and then immediately read the defendant his
> Miranda rights from a printed card, the first of six occasions during that day that
> the defendant was advised of his rights. *See Miranda v. Arizona*, 384 U.S. 436, 86
> S.Ct. 1602, 16 L.Ed.2d 694 (1966). Dorman asked the defendant whether he
> understood his rights, to which the defendant initially replied, "No," adding that
> he was "a little nervous." Dorman then repeated each right, asking after each
> whether the defendant understood it. The defendant replied affirmatively to each.
> The defendant then said, "I think it best if I don't say anything at this time." The
> officers immediately ceased all questions. The defendant did not ask the officers
> to leave the house.
>
> Morse testified that, after a brief interval, he asked the defendant whether he could
> use his telephone to call the police station.[3] The defendant agreed. After the

---

[3] In a footnote, the SJC clarified that:

Earlier, when the police had informed the defendant that they were investigating a
double homicide on behalf of the Boston police department, the defendant had
asked who had died. Dorman replied that he did not know. Morse testified that

(continued...)

telephone call, Morse informed the defendant that the Plymouth police could supply no further information about the crimes, but that someone at the station "was going to get back to me."

Dorman and Morse then went outside, leaving two officers inside the house. The defendant did not ask the remaining two officers to leave. Dorman and Morse examined the automobile in the defendant's driveway, which matched the description given to the Plymouth police. The hood was warm to the touch, and a registration plate other than the defendant's registration number covered the automobile's assigned registration plate.[4]

Dorman and Morse reentered the house, without objection from the defendant. Dorman again asked whether he could use the defendant's telephone to call the Plymouth police station. The defendant again agreed. Dorman informed the lieutenant (within the defendant's hearing) that the defendant was at his residence, that the engine of his automobile was warm, and that there were two different registration plates on his vehicle. The defendant spontaneously stated, "I don't want to incriminate myself, but I have something to say about last night." He told the officers that the night before, two men had forced their way into his home, had kidnapped him, and that he had awoken "in a daze" in the Braintree area, wearing only his underwear. The police did not question the defendant.

The defendant agreed to the officers' request to accompany them to the police station. At the station, Morse and a detective once more advised the defendant of his Miranda rights, and provided him with a written copy delineating each right. Morse again read each right to the defendant. The defendant himself read the form, making a check mark after the listing of each right. Asked whether he wised to talk to them, the defendant replied, "I'm not sure, I don't know if I should say anything or not. What should I do?" Morse responded, "I can't tell

---

[3](...continued)
he asked to use the defendant's telephone, a "land line," rather than use the police scanner because of the sensitive nature of the case and the likelihood that the public would listen to police broadcasts. Morse testified he wanted to find out more information about the investigation to pass along to the defendant.

*Commonwealth v. Michael P. Caputo,* 439 Mass. 153, 158 n.7 (2003), Supp. Ans., Exhibit 8.

[4] The SJC explained in a footnote that "[i]t was later determined that the outer registration plate belonged to a Jamaica Plain resident who lived one-quarter to one-half mile away from the crime scene, while the plate assigned to the defendant's automobile was underneath." *Commonwealth v. Michael P. Caputo,* 439 Mass. at 158 n.8, Supp. Ans. Exhibit 8.

you that, but I want you to be aware of your rights and that you do not have to say anything to me."

Morse once again informed the defendant of his Miranda rights, ascertained that he understood them, and again asked the defendant whether he wished to speak to the police. Then, and only then, the defendant elaborated on the statement he earlier had given to the police in his home. Among other things, the defendant now remembered having blood on him, throwing an object out of his automobile and, at some point during that night, being outside his mother-in-law's home.[5]

At approximately 9:20 a.m., Sergeant Detective Charles Horsley of the Boston police department arrived at the Plymouth police station. Informed that the defendant had received his Miranda rights, he interviewed the defendant for approximately forty-five minutes. When asked whether he had anything to do with the murders, the defendant became upset and stopped talking. The defendant asked to leave the police station, and was informed that he was under arrest.

The motion judge concluded that, although the defendant was not arrested until 1 p.m., his "freedom of action was severely limited from the time that the police arrived at his house," so that he was entitled to Miranda warnings before any police interrogation. The judge further found that, on entering the defendant's house, the officers immediately informed the defendant of his Miranda rights, and ceased all questioning when he indicated that he did not want to speak to them. The judge also found that later, at the Plymouth police station, before any questioning, the defendant again received full and complete Miranda warnings, and then knowingly waived his rights before he voluntarily answered police questions.

*Commonwealth v. Michael P. Caputo,* 439 Mass. 153, 158 n.7 (2003), Supp. Ans., Exhibit 8.

---

[5] In a footnote, the SJC elaborated that "While at the police station, the defendant was offered cigarettes, coffee, and water. A Plymouth detective testified at the suppression hearing that the defendant appeared to be nervous, but not intimidated." *Commonwealth v. Michael P. Caputo,* 439 Mass. at 159 n.9, Supp. Ans., Exhibit 8.

6

**ARGUMENT**

I.    **The Petitioner's Fourth Amendment Claim Raised in Ground One Is Barred from Habeas Review by Stone v. Powell.**

In Ground One of his petition for a writ of habeas corpus, the petitioner asserts that his conviction was obtained by use of evidence gained pursuant to an unconstitutional search in violation of the Fourth Amendment.  This issue was the subject of full and fair litigation in state court, including an evidentiary hearing and a full appeal, and it may not serve as the basis for habeas relief.  *See Stone v. Powell,* 428 U.S. 465, 482 (1976); *Palmigiano v. Houle*, 618 F.2d 877, 878-883 (1st Cir.), *cert. denied* 449 U.S. 901 (1980); *Pignone v. Sands*, 589 F.2d 76, 77 (1st Cir. 1978).

In *Stone v. Powell*, 428 U. S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search was introduced at his trial." *Id.* at 482 (footnote omitted). *See Tart v. Massachusetts*, 949 F.2d 490, 497 n. 6 (1st Cir. 1991).  The Court based its decision on its view that the exclusionary rule was a "judicially created means of effectuating the rights secured by the Fourth Amendment," and reasoned that the "additional contribution, if any" of consideration by federal habeas courts of search-and-seizure claims was "small in relation to the costs" imposed by such review. *See Stone,* 428 U.S. at 482, 493. The Court rejected the notion that state courts were not competent forums for the adjudication of Fourth Amendment claims, and stated:

7

> [W]e are unwilling to assume that there now exists a general lack of appropriate
> sensitivity to constitutional rights in the trial and appellate courts of the several
> States.  State courts, like federal courts, have a constitutional obligation to
> safeguard personal liberties and uphold federal law. *Martin v. Hunter's Lessee*, 1
> Wheat. 304, 341-44 (1816). Moreover, the argument that federal judges are more
> expert in applying federal constitutional law is especially unpersuasive in the
> context of search-and-seizure claims, since they are dealt with on a daily basis by
> trial judges in both systems.  In sum, there is no intrinsic reason why the fact that
> a man is a federal judge should make him more competent, or conscientious, or
> learned with respect to the consideration of Fourth Amendment claims than his
> neighbor in the state courthouse.

*Stone*, 428 U.S. at 493-94, n. 35.

Here, the petitioner claims now, as he claimed in his state court proceedings, that his

conviction was obtained by the use of evidence gained pursuant to an unlawful "search" of his

house.  To the extent that this claim concerns items seized from his home, this claim was fully

and fairly litigated at the state court level.  *See* Memorandum of Decision on Defendant's

Motions to Suppress Evidence and Statements in *Commonwealth v. Michael P. Caputo,* Supp.

Ans., Exhibit 3; *Commonwealth v. Michael P. Caputo,* 439 Mass. 153, 157-63 (2003), Supp.

Ans., Exhibit 8.  To the extent that the petitioner seeks to have his statements excluded on the

grounds that they are the "fruit of the poisonous tree" after an unlawful search and seizure in his

home, the petitioner has had the opportunity to fully and fairly litigate this claim as well.  *See,*

*e.g.,* Supp. Ans., Exhibits 2, 3, and 8.  The record makes it clear that the petitioner filed multiple

motions to suppress, and that he sought to have his statements to the police suppressed.  *See id.*

On appeal to the SJC, the petitioner tried, for the first time, to frame his claim as one under the

Fourth Amendment, rather than under the Fifth Amendment.  *See Commonwealth v. Michael P.*

*Caputo,* 439 Mass. at 162, Supp. Ans., Exhibit 8.  However, all of the facts upon which the

petitioner relies in support of his request to suppress the statements were developed during the

evidentiary hearing on the motion to suppress. *See* Supp. Ans., Exhibit 3.  Moreover, even

though the petitioner decided only after the motions to suppress were decided to present the

request to suppress his statements as a claim under the Fourth, rather than Fifth, Amendment, it

cannot be disputed that he had a full and fair opportunity to litigate any Fourth Amendment claim

he had.  *See Stone v. Powell,* 428 U.S. at 489, 494 (it is the *opportunity* for full and fair litigation

in the state courts, not the quality of the actual litigation, which determines whether a claim is

barred under *Stone*); *O'Berry v. Wainwright*, 546 F.2d 1204, 1214 (5th Cir.), *cert. denied*, 433

U.S. 911 (1977)(a petitioner who is afforded an opportunity to raise a Fourth Amendment claim

within the state court but fails to do so cannot argue that he has been denied the opportunity for

full and fair litigation).

To the extent that the petitioner seeks to claim that he did not have a full and fair

opportunity to litigate his Fourth Amendment claims in state court, the burden is on the petitioner

to prove this point. *See Palmigiano*, 618 F.2d at 881-83; *Pignone*, 589 F.2d at 79-80; *Breest v.*

*Helgemoe,* 579 F.2d 95, 104 (1st Cir.), *cert denied* 439 U.S. 933 (1978).  The petitioner has not

met, and cannot meet, that burden.  Accordingly, Ground One of the petitioner should be

dismissed.

II.     **The Petitioner Is Not Entitled to Habeas Corpus Relief Where the Supreme Judicial Court's Adjudication of His Claims Regarding the Voluntariness of His Statements Was Not Contrary To, or an Unreasonable Application Of, Clearly Established Supreme Court Law.**

In Grounds Two and Three of his petition, the petitioner claims that his conviction was

unlawful because it was obtained using evidence procured in violation of his federal

constitutional right against self-incrimination.  A review of the state court record and the SJC's

9

decision show, however, that the SJC fully evaluated this claim and that the SJC's decision was neither contrary to nor an unreasonable application of controlling Supreme Court authority on this issue.

    A.    <u>Standard of Review</u>

    Since the instant petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). *See also* 28 U.S.C. § 2254. AEDPA "places a new constraint on the power of a federal habeas court to grant a state petitioner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir. 2000)(overruled on other grounds by *McCambridge v. Hall*, 303 F.3d 24 (1st Cir. 2002))("a federal [habeas] court operates within a closely circumscribed sphere"). As the Supreme Court recently reiterated, AEDPA requires a "'highly deferential standard for evaluating state-court rulings' . . . which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 23 (2002)(*per curiam*), *quoting Lindh*, 521 U.S. at 333, n.7. In relevant part, AEDPA precludes a federal court from granting habeas relief, unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. §2254(d)(1-2); *see also Tyler v. Cain*, 533 U.S. 656, 660 (2001). In addition, under AEDPA, state court determinations of factual issues "shall be presumed to be correct" unless the petitioner rebuts this "presumption of

10

correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Coombs*, 202 F.3d at 18.

        1.    *The "Contrary To" Prong*

A state court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (a) where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases or (b) where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor,* 529 U.S. at 405-06. Under either scenario, in order to fall within the "contrary to" clause, the state court decision must be "substantially different," diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court law. *Id.*

        2.    *The "Unreasonable Application Of" Prong*

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. at 407-09, 413. Merely that the state court reached an incorrect result is not sufficient -- the result also must be unreasonable. *L'Abbe v. DiPaolo*, 311 F.3d 93, 96 (1st Cir. 2002), *citing Williams v. Taylor*, 529 U.S. at 411; *see also McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002)(en banc)("'some increment of incorrectness beyond error is required' . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court"), *quoting Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000). Where, for instance, the state court reaches a result that is "devoid

11

of record support for its support for its conclusion or is arbitrary," the unreasonable application

prong likely will be satisfied." *McCambridge*, 303 F.3d at 37, *citing O'Brien v. DuBois*, 145

F.3d 16, 25 (1st Cir. 1998). *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001), *cert.*

*denied* 535 U.S. 960 (2002); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.), *cert. denied* 534 U.S.

925 (2001). In order for a federal habeas court to find that the "unreasonableness" prong has

been met, the state court's determination of either the law or the facts must be *objectively*

unreasonable. *See Williams v. Taylor*, 529 U.S. at 411; *Williams v. Matesanz*, 230 F.3d at 426-

27; *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).

There is no bright-line rule as to what constitutes an "objectively unreasonable" application

of federal law or determination of facts. *Williams v. Taylor*, 529 U.S. at 410 ("[t]he term

'unreasonable' is no doubt difficult to define"). As the Supreme Court has made clear, however,

an incorrect state court determination is not necessarily an unreasonable one. *Id.* ("the most

important point is that an unreasonable application of federal law is different from an *incorrect*

application of federal law")(emphasis in original). It is well-settled that "a federal habeas court

may not issue the writ simply because the court concludes in its independent judgment that the

relevant state-court decision applied clearly established federal law erroneously or incorrectly.

Rather, that application [or determination] must also be unreasonable." *Id.* at 411.

B.    The Massachusetts Supreme Judicial Court's Decision on the Petitioner's Claim
      Regarding the Voluntariness of his Statements Was Neither Contrary To, Nor an
      <u>Unreasonable Application of, Established Federal Law.</u>

Grounds Two and Three of the petition rest on the allegation that the petitioner's

conviction was obtained through evidence which was obtained in violation of the privilege

against self-incrimination contained in the Fifth Amendment. The petitioner appears to argue

that he did not voluntarily waive his rights under *Miranda v. Arizona,* 384 U.S. 436, 478, 86

S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that the statements he gave to the police were not the

product of a voluntary waiver of his right against self-incrimination. However, a review of the

record and the governing law demonstrate that the SJC's decision was neither contrary to nor an

unreasonable application of established Supreme Court precedent on this issue.

        1.     *Supreme Court Authority Governing the Claim Regarding the Privilege*
                *Against Self-Incrimination.*

      The Supreme Court has articulated principles governing the petitioner's contention that he

did not waive his rights under *Miranda v. Arizona* and that his statements to the police were not

the product of a voluntary waiver of the right against self-incrimination. It is beyond question

that before a person in custody may be questioned by authorities, he must be warned of his right

against self-incrimination and his right to the presence of an attorney. *Miranda v. Arizona,* 384

U.S. 436, 444, 467-68 (1966). A defendant may, however, waive his rights, "provided the

waiver is made voluntarily, knowingly and intelligently," and the government bears the "heavy

burden" of proving that the defendant knowingly and intelligently waived his rights under

*Miranda. Id.* at 444, 475 (citing *Escobedo v. Illinois,* 378 U.S. 478, 490 n.14 (1964)).

      The Supreme Court has made clear that waiver of the right against self-incrimination need

not be express, but may be implied. *North Carolina v. Butler,* 441 U.S. 369, 373 (1979)(where

defendant was given *Miranda* rights orally later declined to sign a written waiver, but agreed to

talk to FBI agents, defendant held to have impliedly waived *Miranda* rights). As the Supreme

Court stated in *North Carolina v. Butler*:

        An express written or oral statement of waiver of the right to remain silent or of
        the right to counsel is usually strong proof of the validity of that waiver, but is not

inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. . . . The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

*Butler*, 441 U.S. at 373. *Accord Bui v. Di Paola*, 170 F.3d 232, 240 (1st. Cir. 1999), *cert. denied*

529 U.S. 1086, 120 S.Ct. 1717, 146 L.Ed.2d 640 ("an express statement is not invariably

necessary to support a finding that the defendant waived either the right to remain silent or the

right to counsel"); *United States v. Garcia*, 983 F.2d 1160, 1169 (1st Cir. 1993).

Under the implied waiver rule, the question whether there has been a knowing and

intelligent waiver of *Miranda* rights must be determined on the "particular facts and

circumstances surrounding that case, including the background, experience, and conduct of the

accused." *Butler*, 441 U.S at 374-75 (internal quotations omitted). *Accord Garcia*, 983 F.2d at

1169 ("in considering whether a defendant has voluntarily relinquished his Fifth Amendment

rights, [a court] must examine the 'totality of the circumstances surrounding the interrogation'").

Absent the "crucial element of police overreaching," there is "simply no basis for concluding that

any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connolly*,

479 U.S. 157, 163-64 (1986).

> 2.   *The SJC's Rejection of the Claim That the Trial Court Erred in Not Suppressing the Petitioner's Statements to Police Was Neither "Contrary To" Nor an "Unreasonable Application Of" the Controlling Supreme Court Authority*

Measured against the controlling Supreme Court authority outlined above, the

Massachusetts SJC's decision rejecting the petitioner's motion to suppress claim was neither

"contrary to" nor and "unreasonable application of" controlling Supreme Court precedent. In

rejecting the petitioner's claim, the SJC found that:

> First, before he made any statement, the defendant received and acknowledged
> that he understood his Miranda rights.[] Second, when the defendant indicated a
> wish not to speak to the police, all questioning ceased. *See Commonwealth v.
> Torres*, 424 Mass. 792, 795-796, 678 N.E.2d 847 (1997)("the admissibility of
> statements obtained after an invocation of the right depends on whether the
> person's right to cut off questioning was 'scrupulously honored'"). It was only
> after he overheard the police conversation that the defendant stated, unprovoked,
> that he had been kidnapped the previous night. *See Commonwealth v. Diaz*, 422
> Mass. 269, 661 N.E.2d 1326 (1996), *quoting Miranda v. Arizona*, 384 U.S. 436,
> 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)("Volunteered statements of any kind
> are not barred by the Fifth Amendment").

*Commonwealth v. Michael P. Caputo,* 439 Mass. at 160, Supp. Ans., Exhibit 8.

As to the petitioner's claim that Sergeant Morse's request to use the petitioner's telephone

and subsequent telephone call to the Boston Police department constituted further questioning in

violation of his *Miranda* rights, the SJC rejected this claim, stating:

> We do not agree with the defendant that his statement should be suppressed
> because the police officer's request to use his telephone was "reasonably likely to
> elicit an incriminating response" from the defendant, and therefore the "functional
> equivalent" of an interrogation. *Commonwealth v. Torres, supra* at 797-798, 678
> N.E.2d 847, *quoting Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64
> L.Ed.2d 297 (1980). The telephone call was a report and request for further
> information, an action "normally attendant" to police procedures. *See Rhode
> Island v. Innis, supra.* The defendant's statement occurred only after and
> apparently because he had overheard the telephone conversation that tended to
> implicate him, not because of any "interrogation."

*Commonwealth v. Michael P. Caputo,* 439 Mass. at 160-61, Supp. Ans., Exhibit 8.

The SJC further held that:

> A defendant who is "nervous" because he is in the presence of police within hours
> of committing murder and who chooses to give false information to the police in
> an attempt, however clumsy, to throw them off the trail as he perceives their
> attention focusing on him as a suspect, cannot resort later to a claim of coercion.
> *See Commonwealth v. Harmond,* 376 Mass. 557, 561, 382 N.E.2d 203
> (1978)("the presence of several uniformed officers . . . alone" does not

15

> "necessarily compel[] such a finding" of coercion). *CF. Commonwealth v. Bryant*,
> 390 Mass. 729, 737, 459 N.E.2d 792 (1984), *quoting Miranda v. Arizona, supra*
> at 445, 86 S.Ct. 1602.

*Commonwealth v. Michael P. Caputo*, 439 Mass. at 161, Supp. Ans. Exhibit 8. (ellipses and

brackets in original).

The record makes it clear that the petitioner knowingly and intelligently waived his

*Miranda* rights and voluntarily spoke to the police. The petitioner was advised of his *Miranda*

rights on six separate occasions on the day on which he gave the statements to the police. *See*

Supp. Ans., Exhibit 8. The petitioner received and read a written statement of his *Miranda*

rights. *Id.* As the SJC noted, at the time when the petitioner stated that he did not wish to talk to

the police, "[t]he officers immediately ceased all questions." *Id.*

As to the suggestion that the petitioner's statements at the police station were involuntary

and/or should have been suppressed due to the presence and/or actions of the police officers at

the petitioner's house earlier in the day, this argument is wholly unsupported by the record. As

the SJC held:

> Because we reject the defendant's claims that his statements to the police at his
> home should have been suppressed, we need not consider his argument that his
> later statements should have been suppressed as "fruit of the poisonous tree." *See*
> *Commonwealth v. Painten*, 429 Mass 536, 542, 709 N.E.2d 423 (1999). . . .There
> was no initial unlawful police action and [therefore] no need to suppress any
> subsequent statements. *See Commonwealth v. Smith,* 412 Mass. 823, 831-32, 539
> N.E.2d 1288 (1992); *Commonwealth v. Watkins*, 375 Mass. 472, 482, 379 N.E.2d
> 1040 (1978).

*Commonwealth v. Michael P. Caputo,* 439 Mass. at 162, Supp. Ans., Exhibit 8.

In light of the foregoing, the SJC's decision that the petitioner knowingly and intelligently

waived his *Miranda* rights and voluntarily gave statements to the police was, at the very least,

objectively reasonable. The SJC based its decision on a fully-developed factual record and on Massachusetts cases which cited to and followed Supreme Court holdings with respect to *Miranda* rights and whether the petitioner's statements to the police could be considered voluntary. The SJC's denial of the petitioner's appeal of his conviction (and of the denial of his motion for a new trial) for was not, therefore, either contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. Under AEDPA, the key question is not whether this Court concludes that the Commonwealth had shown that the petitioner's statements were the product of a voluntary waiver of his rights, but rather whether the state court decision is arbitrary and without support in the record, reaching an "increment of incorrectness beyond error . . . great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *McCambridge*, 303 F.3d at 37. The SJC's decision was not unreasonable or contrary to Supreme Court law, and thus the petition should be dismissed.

## CONCLUSION

For the foregoing reasons, the respondent requests that this Court deny the petition for a writ of habeas and dismiss the petitioner's complaint in its entirety.

17

Respectfully submitted,

THOMAS F. REILLY,
ATTORNEY GENERAL


*Maura D. McLaughlin*
Maura D. McLaughlin
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200, ext. 2857
BBO # 634923

Dated:      June 15, 2004


## CERTIFICATE OF SERVICE

I hereby certify that I have this 15th day of June, 2004, served a true and accurate copy of the foregoing pleading on counsel for the petitioner, Michael Caputo, by depositing a copy in the office repository for collection and delivery by first class mail, postage prepaid, to the petitioner's counsel at the following address: John J. Courtney, Esq., 90 Salem Street, Malden, Massachusetts, 02148.


*Maura D. McLaughlin*
Maura D. McLaughlin