# United States District Court
# District of Massachusetts

MICHAEL CAPUTO,
    Petitioner,

v.　　　　　　　　　　　　　　　　CIVIL ACTION NO. 04-10732-JLT

KENNETH NELSON,
    Respondent.

## *REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS (#1)*

COLLINGS, U.S.M.J.

### *I. Introduction*

On April 12, 2004, Michael Caputo ("Caputo" or the "petitioner") commenced the instant action by filing a petition for writ of habeas corpus (the "petition") pursuant to 28 U.S.C. § 2254 (#1); on May 13, 2004, he filed a Memorandum [in Support of the Petition for Writ of Habeas Corpus]. (#15) On June 16, 2004, the respondent Kenneth Nelson (the "respondent") submitted an Answer to the petition (#8), a Supplemental Answer (#7) and a

Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254(#9). In turn, on August 16, 2004, the petitioner filed another Memorandum of Law in Support of his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (#13) in which he, *inter alia*, concedes that Ground One of his petition should be dismissed.

This case has been referred to the undersigned for the issuance of a Report and Recommendation on the petition (Order of Reference #4). For the reasons discussed below, the Court shall recommend that the petition be dismissed in its entirety.

## *II. The Facts and the Procedural History*[1]

I hereby adopt the version of the facts recounted by the Massachusetts Supreme Judicial Court (the "SJC") in *Commonwealth v. Caputo*, 439 Mass. 153, 786 N.E.2d 352 (2003) and presume all of those facts to be true as I must pursuant to 28 U.S.C. § 2254(e)(1). The following is a verbatim recital of those facts from the SJC opinion:

> At approximately 6:25 A.M., after the Plymouth police had been informed by the Boston police that the

---

[1] The petitioner's recitation of the facts and procedural history is set forth throughout his two memoranda of law (##13, 15), and the respondent's version is at pp. 2-6 of his Memorandum of Law in Opposition to Petitioner's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254(#9).

defendant was a suspect in a double homicide, six officers from the Plymouth police department, including Sergeant Thornton Morse and Sergeant Richard Dorman, arrived at the defendant's house. In an attempt to ascertain whether anyone was home, the police officers knocked repeatedly on the front and rear doors. After the police knocked for five minutes, the defendant opened the front door. Morse and Dorman introduced themselves, inquired as to the defendant's name, and asked whether they could enter the house to speak to him. The defendant responded, "Come on in."

Inside the house, Dorman informed the defendant that the police were investigating a double homicide, and then immediately read the defendant his Miranda rights from a printed card, the first of six occasions during that day that the defendant was advised of his rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Dorman asked the defendant whether he understood his rights, to which the defendant initially replied, "No," adding that he was a "little nervous." Dorman then repeated each right, asking after each whether the defendant understood it. The defendant replied affirmatively to each. The defendant then said, "I think it best if I don't say anything at this time." The officers immediately ceased all questions. The defendant did not ask the officers to leave the house.

Morse testified that, after a brief interval, he asked the defendant whether he could use his telephone to call the police station. The defendant agreed. After the telephone call, Morse informed the defendant that the Plymouth police could supply no further information about the crimes, but that someone at the station "was going to get back to me."

Dorman and Morse then went outside, leaving two officers inside the house. The defendant did not ask the remaining two officers to leave. Dorman and Morse examined the automobile in the defendant's driveway, which matched the description given to the Plymouth police. The hood was warm to the touch, and a registration plate other than the defendant's registration number covered the automobile's assigned registration plate.

Dorman and Morse reentered the house, without objection from the defendant. Dorman again asked whether he could use the defendant's telephone to call the Plymouth police station. The defendant again agreed. Dorman informed the lieutenant (within the defendant's hearing) that the defendant was at his residence, that the engine of his automobile was warm, and that there were two different registration plates on his vehicle. The defendant spontaneously stated, "I don't want to incriminate myself, but I have something to say about last night." He told the officers that the night before, two men had forced their way into his home, had kidnapped him, and that he had awoken "in a daze" in the Braintree area, wearing only his underwear. The police did not question the defendant.

The defendant agreed to the officers' request to accompany them to the police station. At the station, Morse and a detective once more advised the defendant of his Miranda rights, and provided him with a written copy delineating each right. Morse again read each right to the defendant. The defendant himself read the form, making a check mark after the listing of each right. Asked whether he wished to talk to them, the defendant replied, "I'm not sure, I don't know if I should say anything or not. What should I

> do?" Morse responded, "I can't tell you that, but I want you to be aware of your rights and that you do not have to say anything to me."
>
> Morse once again informed the defendant of his Miranda rights, ascertained that he understood them, and again asked the defendant whether he wished to speak to the police. Then, and only then, the defendant elaborated on the statement he earlier had given to police in his home. Among other things, the defendant now told the officers that he remembered having blood on him, throwing an object out of his automobile and, at some point during that night, being outside his mother-in-law's home.
>
> At approximately 9:20 A.M. Sergeant Detective Charles Horsley of the Boston police department arrived at the Plymouth police station. Informed that the defendant had received his Miranda rights, he interviewed the defendant for approximately forty-five minutes. When asked whether he had anything to do with the murders, the defendant became upset and stopped talking. The defendant asked to leave the police station, and was informed that he was under arrest.

*Commonwealth v. Caputo,* 439 Mass. 153, 157-159, 786 N.E.2d 352, 366-8 (2003) (footnotes omitted).

On November 17, 1989, a Suffolk County grand jury returned two first-degree murder indictments against the petitioner for the stabbing deaths of his mother-in-law and his estranged wife. On January 28, 1991, the petitioner filed multiple motions to suppress evidence. After a hearing, the Superior Court

5

judge denied the motions, except to order the suppression of personal papers or notebooks seized by the police during the search of the petitioner's home pursuant to a search warrant.  On March 21, 1991, after a trial, the jury returned a verdict of guilty on both indictments.  The trial judge imposed consecutive life sentences.

On November 23, 1992, the petitioner appealed the convictions, and on February 15, 1994, the petitioner filed a motion for a new trial.  On May 17, 1995, a single justice of the SJC remanded the motion to the Superior Court for disposition.  On February 26, 1996, a Justice of the Superior Court denied the motion, and on June 12, 1996, the petitioner appealed the denial of the motion.  On April 15, 2003, the SJC affirmed the judgments of the trial court and upheld the petitioner's convictions.  On April 12, 2004, the petitioner filed the instant petition.

### III. *Discussion*

#### A. The Grounds of the Instant Petition

The petitioner asserts that he is entitled to habeas relief based on two separate grounds, i.e.,[2]

| | |
|---|---|
| *Ground Two:* | Conviction obtained by a violation of the privilege against self-incrimination (#1 ¶ 12B) |
| | Supporting Facts: After the police obtained the petitioner's consent to enter his house to talk, the police read the petitioner his Miranda rights. The petitioner said he did not want to speak to the police. After several minutes pass, the petitioner asks the police the identity of the deceased. The Plymouth police do not know but tell the petitioner the Boston police want to talk to him. The petitioner again expresses his desire to remain silent by stating he did not wish to incriminate himself and he didn't want to say anything. The police remain in the house. The police ask to use the phone to call the station to get more information which they will pass on to the petitioner. While the police make the phone call, the petitioner makes a statement which is incriminating. |
| *Ground Three:* | Conviction obtained by a violation of the |

---

[2] The petitioner originally included three grounds in his petition but subsequently requested dismissal of one of the grounds, Ground One. *See* #13 ("The argument in respondent's brief as to ground one is correct. Accordingly, Ground One of the petitioner should be dismissed.") For the sake of clarity, the grounds still remaining will be referred to as Grounds Two and Three. The grounds and supporting facts are set forth herein verbatim from the petition except that the word "petitioner" is substituted for the word "defendant".

> privilege against self incrimination (#1 ¶ 12C)
>
> <u>Supporting Facts:</u> After giving an incriminating statement at the house the petitioner is asked to go to the police station to discuss his statement in a more detailed manner. The petitioner agrees. After signing a Miranda waiver, he expands on the statement he gave at the house.

The respondent argues that the petitioner is not entitled to habeas relief on either of his claims because the SJC's adjudication of those claims was not contrary to or an unreasonable application of established Supreme Court law. (#9, p. 9) The petitioner, on the other hand, appears to contend that the SJC's decisions were unreasonable applications of established Federal law because the police's actions of using the phone in the petitioner's home after the petitioner expressed his desire to remain silent amounted to interrogation under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the SJC did not take into account all the facts leading up to the petitioner making his initial statement to the police.

Because I will recommend that the petition be denied, I will address each of the grounds raised by the petitioner and explain why neither provides a basis for habeas relief. In short, I must determine whether any of the state court legal determinations were "contrary to" or "unreasonable applications of" established

Supreme Court law.[3] In order to make such determinations, it is necessary first to set forth the applicable standards.

### B. Standards for Granting Habeas Corpus Relief

Title 28 U.S.C. § 2254(d), the applicable habeas corpus statute, provides that:

> An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

#### 1. "Contrary To" Standard - 28 U.S.C. §2254(d)(1)

The Supreme Court has explained that "a state court decision is 'contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases' or 'if the state court

---

[3] The petitioner does not argue that the state court decisions were based on unreasonable determinations of fact in light of the evidence presented. Thus, I need not address 28 U.S.C. § 2254(d)(2).

Supreme Court law.[3] In order to make such determinations, it is necessary first to set forth the applicable standards.

### B. Standards for Granting Habeas Corpus Relief

Title 28 U.S.C. § 2254(d), the applicable habeas corpus statute, provides that:

> An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

#### 1. "Contrary To" Standard - 28 U.S.C. §2254(d)(1)

The Supreme Court has explained that "a state court decision is 'contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases' or 'if the state court

---

[3] The petitioner does not argue that the state court decisions were based on unreasonable determinations of fact in light of the evidence presented. Thus, I need not address 28 U.S.C. § 2254(d)(2).

confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)(citing *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000)). In deciding whether the "contrary to" prong applied, the court in *Hurtado v. Tucker* stated that "this case presents a good example of one to which § 2254(d)(1)'s 'contrary to' prong does not apply: 'a run-of-the-mill state-court decision applying the correct legal rule from [the Supreme Court's] cases to the facts of a prisoner's case.'" 245 F.3d 7, 15 (1 Cir., 2001), *cert. denied*, 534 U.S. 925 (2001) (quoting *Williams*, 529 U.S. at 405-06).

    2. *"Unreasonable Application of" Standard - 28 U.S.C. §2254(d)(1)*

> The Supreme Court in *Williams* held that a state court decision would involve an "unreasonable application of" clearly established Supreme Court precedent if it "identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case...." The Court also underscored that "an *unreasonable* application of federal law is different from an incorrect application of federal law."... Rather, that application must also be unreasonable."

*Hurtado,* 245 F.3d at 15-16 (quoting *Williams*, 529 U.S. at 410-11)(internal citations and footnote omitted)(emphasis in original).

    The *Hurtado* court explained further that:

> ...the Supreme Court in *Williams* explicitly rejected the

> view...that an 'unreasonable application of' clearly established federal law requires that the application be one that *all* reasonable jurists would agree was unreasonable....Thus, the test is an objective one and not so stringent as to require that all reasonable jurists agree the state court decision was unreasonable."

*Id.,* 245 F.3d at 17 (emphasis in original); *see also McCambridge v. Hall*, 303 F.3d 24, 36 (1 Cir., 2002)(overruling *O'Brien v. Dubois*, 145 F.3d 16, 25 (1 Cir., 1998) and *Williams v. Matesanz*, 145 F.3d 16 (1 Cir., 1998) in holding that for a state court determination to be considered an "unreasonable application" of federal law, there must be "some increment of incorrectness beyond error" such that the decision is considered unreasonable in the "independent and objective judgment of the federal court.").

### C. Applying the Standards to the Instant Petition

In a nutshell, Ground Two and Ground Three of the petition appear to rest on the same premise, i.e., that the SJC's decisions affirming the petitioner's convictions and affirming the denial of the motion to suppress the petitioner's statements were erroneous because the petitioner decided to keep silent and the police's subsequent actions of remaining in the petitioner's house and making phone calls in the house amounted to "interrogation" as defined in *Miranda*. That is, the petitioner's rights were violated under *Miranda* because even after he expressed his desire to remain silent, the police's actions were the "functional equivalent" of express questioning. (#13, p. 2) In sum, the gist of the argument seems to be that the petitioner did not waive his rights under *Miranda* and that

11

his statements to the police were not the product of a voluntary waiver of the right against self-incrimination.

It is clear here that the controlling Supreme Court precedent upon which the petitioner relies is *Miranda v. Arizona.* That case stands for the proposition that before a person in custody may be questioned by the police, he must be warned of his right against self-incrimination and his right to an attorney. The petitioner also refers to *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980), a case which elaborates on *Miranda*, and holds that "interrogation...refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to evoke an incriminating response from a suspect...amounts to interrogation."

However, the petitioner's assertion that the police's actions of using the telephone in the petitioner's house amounted to interrogation under *Miranda* and *Innis* because such actions were "designed to elecit [sic] an incriminating response" from the petitioner (#13, p. 4), was squarely rejected by the SJC:

> We do not agree with the [petitioner] that his statement should be suppressed because the police officer's request to use his telephone was "reasonably likely to elicit an incriminating response" from the [petitioner], and therefore the "functional equivalent"

> of an interrogation....The telephone call was a report and request for further information, an action "normally attendant" to police procedures....The [petitioner's] statement occurred only after and apparently because he had overheard the telephone conversation that tended to implicate him, not because of any "interrogation."

*Caputo*, 439 Mass. at 160-61, 786 N.E.2d at 358 (internal citations omitted).

The SJC cited to *Innis* in reaching its decision that the police's use of the telephone was "normally attendant" to police procedures and thus was not reasonably likely to elicit an incriminating response from the petitioner. In other words, according to the SJC, the police's actions did not amount to interrogation and thus did not violate the petitioner's *Miranda* right to remain silent. The petitioner does not directly address the SJC's holding, other than to assert that "when the police make the second phone call it is done in a setting where [the petitioner] has already been told the conversation will continue. The police will obtain updated information and will pass it on obviously causing [the petitioner] to respond, a clear violation of Miranda." (#13, p. 5)

The petitioner cites no Supreme Court case (or any case) for the proposition that the police's use of the telephone in the presence of a petitioner is *not* normally attendant to arrest and custody; he simply contends, without

13

factual or legal support, that the police's use of the telephone was designed to elicit an incriminating response from the petitioner. Indeed, the petitioner in his papers has done little more than put forth an argument without any basis. Thus, the petitioner has not come close to establishing that the SJC's decisions were unreasonable applications of, or contrary to, *Miranda* or *Innis.*

And, a review of the facts of the case at bar leads to the inevitable conclusion that the police's actions were not designed to elicit an incriminating response from the petitioner, at least under the standard set out in *Innis*. In that case, the Supreme Court held that the police's actions of having a conversation in a police vehicle in the presence of a suspect (who had invoked his right to counsel) regarding a missing shotgun[4] did not amount to interrogation under *Miranda*. During the conversation, the suspect interrupted to tell the police officers where they could locate the gun and eventually, the suspect was convicted of robbery, murder and kidnaping. *Innis*, 446 U.S. at 295-96. The *Innis* court concluded that "since the police cannot be held accountable for the unforeseeable results of their words or actions, the definition of

---

[4] Specifically, one of the officers said that there were "a lot of handicapped children running around in this area" because a school for such children was nearby, and "God forbid one of them might find a weapon with shells and they might hurt themselves." *Innis*, 446 U.S. at 294-95.

interrogation can extend only to words or actions on the part of the police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301-02 (emphasis in original). In the instant case, there is no evidence that the police knew or should have known that making a phone call in the petitioner's presence would be likely to elicit an incriminating response from the petitioner. Thus, the petitioner here simply has no basis for his argument that the state court rulings were contrary to, or unreasonable applications of, *Miranda* and *Innis*.

The petitioner's only other argument is that the SJC did not take into account all the facts that existed leading up to the petitioner making his initial statement to police. (#13, p. 3) However, the petitioner does not clearly explain which facts the SJC purportedly did not take into account, nor does the petitioner cite to any Supreme Court case (other then generally to *Miranda*) for the premise that a court must take into account all facts surrounding petitioner's questioning by the police.[5] It is apparent, moreover, that the SJC did consider numerous facts in reaching its decision given that its written opinion contains

---

[5] The petitioner's two sentence argument that the SJC erred in not applying the *Wong Sun* "fruit of the poisonous tree" doctrine because it rejected the petitioner's claims that his statements should be suppressed need not be addressed because the petitioner has not established that the SJC's decision on the motion to suppress was contrary to, or an unreasonable application of, established Supreme Court law.

a fifteen paragraph recitation of the facts of the case. *See Caputo*, 439 Mass. at 155-157, 786 N.E.2d at 355-57.[6]

In conclusion, the petitioner has not shown that any of the SJC's decisions in his case were contrary to, or unreasonable applications of, Supreme Court law. The SJC relied on a well-developed factual record in reaching its decisions, and there certainly is no indication (and indeed, there is evidence to the contrary) that the SJC's decisions were arbitrary such that the decisions could be said to be unreasonable. Moreover, the SJC properly applied the holdings of *Miranda* and *Innis*. Thus, there is no basis for granting the petition for a writ of habeas corpus.

## IV. Recommendation

For the foregoing reasons, I RECOMMEND that the petitioner's petition for writ of habeas corpus (#1) be DISMISSED.

## V. Review by the District Judge

The parties are hereby advised that pursuant to Rule 72, Fed. R. Civ. P., any party who objects to this recommendation must file specific written

---

[6] The SJC noted, for example, that the petitioner received and acknowledged that he understood his *Miranda* rights, that when the petitioner indicated a wish not to speak to police, all questioning ceased, that the petitioner gave the police consent to enter his home, that he never asked them to leave and spoke to them only after he recognized that the police had seen potentially incriminating evidence outside. *Caputo*, 439 Mass. at 160-61, 786 N.E.2d at 358-59.

objections thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the recommendation, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Robert B. Collings
ROBERT B. COLLINGS
November 10, 2005.   United States Magistrate Judge